IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROY TANAY : | |
| : | CIVIL ACTION |
| v. : | |
| : | NO. 10-792 |
| ENCORE HEALTHCARE, LLC ET AL. : | |

**SURRICK, J.**                                                                                              **AUGUST 26, 2011**

**MEMORANDUM**

    Presently before the Court is Defendants' Amended Motion to Dismiss Plaintiff's Amended Complaint. (ECF No. 6.) For the following reasons, Defendants' Amended Motion will be granted in part and denied in part.

**I.     BACKGROUND**

    Defendant Encore Healthcare, a Maryland corporation, provides healthcare services to nursing homes, assisted-living facilities, and hospitals. Encore provides management services to Andorra Woods Healthcare Center, a nursing home in Whitemarsh, Pennsylvania. Defendant Rest Haven Nursing Center Whitemarsh, a Pennsylvania corporation, owns and operates Andorra Woods. Defendants receive Medicaid funds from the Commonwealth of Pennsylvania.

    Plaintiff Roy Tanay, a Pennsylvania resident, began working for Defendants on July 10, 2006, as the administrator of Andorra Woods. As the nursing home administrator, Plaintiff was responsible for the overall management of the facility and ensuring the health care and safety of the residents. On October 19, 2009, Plaintiff wrote a letter to Matthew Auman, Encore's Chief Operating Officer, reporting an incident at Andorra Woods. The letter states as follows:

    Dear Mr. Auman,

I am writing to request your help in response to a serious incident that occurred this past Friday at Andorra Woods Healthcare Center. As the Administrator, I believe I have the responsibility to ensure that the highest officer in our company is fully aware of the circumstances, events and decisions that led up to the incident. The intent of this letter is not to jeopardize anyone's employment with Encore. Rather, it is to prevent similar events from ever recurring.

On Friday around 7:10 AM, one of our maintenance employees entered the boiler room to turn on the heating system as we do around this time every year. When entering the room, he immediately noticed a strong smell of gas. As required, he called 9-1-1 and the local authorities arrived. To their surprise, they noticed obvious signs of intentional sabotage to the two boilers. The control panels were destroyed, wires were ripped, and a gas pipe was disconnected.

Unfortunately, this is not the first time something like this has happened at Andorra Woods. Previous theft and vandalism and at least two documented incidents of employee violence have occurred since I became the administrator in 2006.

Since November, 2007 I have repeatedly reported these events to my superior and have asked for his assistance and advice on how to best stop or minimize the issues since (I can share that documentation upon request if necessary). The only response I received was that a "culture change" and better hiring practices would resolve these incidents. Although this general advice may help curtail issues with new hires, I did not believe it will help our current situation.

As a result, in March, 2009, I requested that ADT (security company) propose and bid on a security system for AW that would address the issues of controlled access to the facility and allow surveillance cameras in non-residential areas. The proposals were presented to my superiors at Encore on 3/20/09. However, the proposals were rejected on financial and legal grounds.

The repair of the two boilers will cost more than $25k, over $20k more than the cost of the proposed security system. Additionally, the gas leak could have very easily caused an explosion that could have caused collateral property damage and seriously injured or killed many employees and residents. I cannot even fathom the financial and personal devastation it could have caused Encore Healthcare.

Work-place theft, vandalism and violence have had a tremendous negative impact on employee performance and morale. Residents and their families feel insecure and helpless and the facility's reputation is damaged.

A security system may not have prevented all of these prior incidents. However, I strongly believe that it would have proven to our customers (residents, families and

> employees) that we are taking these instances very seriously and that we are willing to invest in their safety. Moreover, it will allow the authorities to investigate these incidents thoroughly with a chance of finding the criminals.
>
> The event on Friday has escalated the need to address and resolve our concerns to the highest priority. As the person responsible for the safety of Andorra Woods' residents and employees, I am asking you to consider a more proactive approach to our day-to-day operational needs, especially when it comes to the safety of our residents and employees.
>
> I remain optimistic that my concerns can be resolved in a timely manner and I look forward to working on potential solutions with you.

(Am. Compl. Ex. A, ECF No. 4.)

On November 2, 2009, Defendants terminated Plaintiff's employment. Plaintiff, who is Jewish, alleges that Defendants offered no legitimate business reason for his termination. On March 18, 2010, Plaintiff filed an Amended Complaint, which includes claims for Wrongful Discharge (Count One), violation of the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. § 1421 *et seq.* (Count Two), and violation of 42 U.S.C. § 1981 (Count Three). On April 23, 2010, Defendants filed an Amended Motion to Dismiss.

## II. LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint that merely alleges entitlement to relief, without alleging

facts that show entitlement, must be dismissed. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). This "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

## III. DISCUSSION

### A. Wrongful Discharge

Plaintiff argues that he was wrongfully discharged from his employment, in violation of public policy. Generally, an employer may terminate an at-will employee for any reason, with or without cause. *Shick v. Shirey*, 716 A.2d 1231, 1233 (Pa. 1998). An exception to this rule exists where the termination violates public policy. *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (Pa. 2000). To state a cause of action under the public policy exception to the at-will employment doctrine, a plaintiff must point to a "clear public policy articulated in the constitution, in legislation, an administrative regulation, or a judicial decision." *Hunger v. Grand Cent. Sanitation*, 670 A.2d 173, 175 (Pa. Super. Ct. 1996). Pennsylvania courts have not explicitly defined the boundaries of the public policy exception, however, its application has been limited to situations in which an employer: (1) requires an employee to commit a crime; (2) prevents an employee from complying with a statutorily imposed duty; and (3) discharges an employee when specifically prohibited from doing so by statute. *See, e.g.*, *Spierling v. First Am. Home Health Servs., Inc.*, 737 A.2d 1250, 1252 (Pa. Super. Ct. 1999) (citations omitted); *Hennessy v. Santiago*, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998) (citations omitted). Plaintiff and Defendants agree that the first and third categories are not applicable to Plaintiff's

allegations.

The Supreme Court of Pennsylvania has emphasized that the public policy exception is not to be liberally construed. *McLaughlin*, 750 A.2d at 287 ("An employee will be entitled to bring a cause of action for a termination of that relationship only in the most limited of circumstances where the termination implicates a clear mandate of public policy in this Commonwealth."). For example, Pennsylvania "will not recognize a wrongful discharge claim when an at-will employee's discharge is based on a disagreement with management about the legality of a proposed course of action unless the action the employer wants to take actually violates the law." *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 328 (3d Cir. 1993).

Plaintiff's wrongful discharge claim relies on the public policy found in the Nursing Home Administrators License Act, 63 Pa. Stat. § 1101 *et seq.*, as implemented by 49 Pa. Code § 39.1 *et seq.*, and the Health Care Facilities Act, 35 Pa. Stat. § 448.101 *et seq.*, as implemented by 28 Pa. Code § 201.1 *et seq.* Plaintiff argues that Andorra Woods is a nursing home regulated by these statutes and their regulations. Pursuant to the Health Care Facilities Act, Defendants are required to adopt and enforce rules to ensure the health care and safety of the residents, and the protection of personal and property rights of the residents. 28 Pa. Code § 201.18(b)(1)-(2). Defendants are also required to "appoint a full-time administrator who is currently licensed and registered in this Commonwealth and who is responsible for the overall management of the facility." *Id.* § 201.18(e). The administrator's responsibilities include: (1) enforcing the regulations relative to the level of health care and safety of the residents and to the protection of their personal and property rights; and (2) maintaining an ongoing relationship with the governing body, medical and nursing staff and other professional and supervisory staff through

meetings and periodic reports. *Id.* In addition, the Nursing Home Administrators License Act requires an administrator to:

> (i) Develop policies which govern the continuing care and related medical and other services provided by the facility which reflect the facility's philosophy to provide a high level of resident care in a healthy, safe and comfortable environment.
>
> (ii) Evaluate the quality of resident care and efficiency of services, identify strengths and weaknesses and set in place measures for improvements where necessary, and evaluate progress and institute appropriate follow-up activities.
>
> (iii) Set in place a functional table of organization with standards of accountability and hold department heads accountable for the performance of their respective departments.
>
> (iv) Maintain open lines of communication with the governing body, department heads, facility staff and its residents to assure resources are properly allocated and that resident care is maintained at a high level.
>
> (v) Review the reports of the medical director and outside resources and consider for possible implementation.
>
> (vi) Maintain compliance with governmental regulations and assure that the facility's nondiscriminatory policy and policy on resident rights are available for inspection by the public.

49 Pa. Code § 39.91(1).

Plaintiff argues that consistent with his statutory and regulatory obligations, he sent the October 19, 2009 letter to Defendants' Chief Operating Officer reporting the incidents at Andorra Woods. Plaintiff's letter describes among other things the incident in which two boilers at Andorra Woods were intentionally sabotaged and leaking gas. The letter also advises that Andorra Woods recently experienced several instances of theft, vandalism and employee violence. Plaintiff's letter advises that he reported these events to his superiors and requested that Andorra Woods purchase a new security system. The letter expresses Plaintiff's concern for

the safety of the nursing home residents and employees. Plaintiff's proposals were rejected. Two weeks after receiving the letter Defendants terminated Plaintiff's employment. Plaintiff argues that he was properly carrying out his statutory duties and was fired as a result, in violation of public policy. Defendants respond that Plaintiff's wrongful discharge claim fails because Plaintiff did not have any affirmative duty to report these incidents. Defendants cite several cases in support of their argument.

In *Spierling*, cited by Defendants, a registered nurse was terminated after she reported suspected Medicare fraud to federal investigators. 737 A.2d at 1250-51. The Pennsylvania Superior Court rejected the plaintiff's wrongful discharge claim because the Professional Nursing Law[1] did not "mandate that she report, under threat of penalty, the sort of past alleged fraud discovered by her." *Id.* at 1254.

In *Brennan v. Cephalon, Inc.*, 298 F. App'x 147, 148 (3d Cir. 2008), also cited by Defendants, the plaintiff, who was assigned to audit the defendant's compliance with FDA requirements, prepared a report to the FDA disclosing the defendant's noncompliance. After discussing the report with his employer at several meetings, the plaintiff was terminated. The Third Circuit found that the statutes which the plaintiff relied upon[2] imposed no affirmative duty on him to report his audit findings to the FDA. *Id.* at 151. The court distinguished the case from *Field v. Philadelphia Electric Co.*, 565 A.2d 1170 (Pa. Super. Ct. 1989), a case in which the Pennsylvania Superior Court held that an employee who was terminated for reporting his employer's violations of Nuclear Regulatory Commission regulations articulated a wrongful

---

[1] 63 Pa. Stat. § 211 *et seq.*, as implemented by 49 Pa. Code § 21.18.

[2] 18 U.S.C. §§ 371, 1001; 18 Pa. Cons. Stat. Ann. § 4911.

discharge claim. *Brennan*, 298 F. App'x at 151.  In *Field*, the plaintiff had an affirmative duty under the Energy Reorganization Act, 42 U.S.C. § 5846, to report noncompliance and was subject to fines if he failed to do so.  565 A.2d at 1176-77, 1180.

In addition, Defendants cite *Diberardinis-Mason v. Super Fresh, Inc.*, in which the plaintiff pharmacist was terminated after she reported "'irregularities' in the dispensing of controlled substances" to the store director and manager.  94 F. Supp. 2d 626, 629 (E.D. Pa. 2000).  The plaintiff cited the Pharmacy Act, 63 Pa. Stat. § 390-1 *et seq.*, which provides general guidelines for pharmacists' conduct, as the basis of her wrongful termination claim.  *Id.*  The court held that no public policy emanated from this statute that required the plaintiff to report suspicious behavior.  *Id.* at 629-30 ("[W]hile her desire to ferret out illegal activity may be laudable, it will not form the basis of a wrongful discharge claim.").  The court distinguished the case from *Field*.  *Id.*

Finally, Defendants cite cases that support the proposition that submitting internal reports to an employer, rather than to a federal or state agency, is generally not protected under the public policy exception.  *See Geary v. U.S. Steel Corp.*, 319 A.2d 174, 175 (Pa. 1974); *McLaughlin,* 750 A.2d at 287-89; *Diberardinis-Mason*, 94 F. Supp. 2d at 630.  In *Geary*, a salesman was fired after he complained to his employer about the safety of a new product.  319 A.2d at 175.  The Pennsylvania Supreme Court refused to extend the plaintiff a non-statutory cause of action, in part, because there was "no suggestion that he possessed any expert qualifications, or that his duties extended to making judgments in matters of product safety."  *Id.* at 181.

Relying on *Geary*, the court in *McLaughlin* rejected the plaintiff's wrongful discharge claim where the plaintiff, without her employer's knowledge, obtained a sample of a chemical,

gluteraldehyde, which her employer stored on the premises, and sent it to a testing laboratory for a toxicity report. 750 A.2d at 284-289. The laboratory concluded that the gluteraldehyde level was higher than OSHA's maximum exposure limit. *Id.* at 285. The plaintiff complained to her superiors on several occasions and was subsequently terminated. The Pennsylvania Supreme Court rejected her wrongful discharge claim, which was premised on federal OSHA violations. *Id.* at 287-89. The court noted that the plaintiff "has not shown any policy of this Commonwealth that is violated, and has not established how a private report to an employer would undermine the workings of any Commonwealth agency or any statutory mechanism within the Commonwealth." *Id.* at 288. Specifically, the court determined that:

> in order to set forth a claim for wrongful discharge a Plaintiff must do more than show a possible violation of a federal statute that implicates only her own personal interest. The Plaintiff in some way must allege that some *public* policy of *this* Commonwealth is implicated, undermined, or violated because of the employer's termination of the employee. Public policy of the Commonwealth must be just that, the policy of this Commonwealth.

*Id.* at 289 (emphasis in original).

Recognizing Pennsylvania's strong adherence to the employment-at-will doctrine, the instant case can nevertheless be distinguished from the cases cited by Defendants. Andorra Woods is statutorily required to hire a licensed, registered administrator who is responsible for the overall management of the facility. 28 Pa. Code § 201.18(e). Plaintiff, as the administrator, was required to develop policies that provide a high level of resident care in a safe environment, Plaintiff was required to evaluate the quality of resident care, identify strengths and weaknesses, and institute appropriate follow-up activities. 49 Pa. Code § 39.91(1). Plaintiff was also required to maintain open lines of communication with the governing body to assure that

resources are properly allocated and that resident care is maintained at a high level.  *Id.*

Plaintiff transmitted his October 19, 2009 letter to management pursuant to the statutory obligations which placed on him the responsibility of ensuring the safety of Andorra Woods' residents and employees.  Plaintiff expressed his concerns for a series of incidents that presented a significant danger to Andorra Woods, its residents and its employees.  He evaluated the problem and proposed a solution to improve the situation.  For this he was fired.  The Pennsylvania Code required Plaintiff to maintain open lines of communication with Andorra Woods' governing body with respect to issues of resident care and safety.

Unlike the instant case where Plaintiff was responsible for the overall management and safety of Andorra Woods, the cases cited by Defendants involved plaintiffs who had no similar statutory obligations.  In *Spierling* and *Diberardinis-Mason*, the plaintiffs cited statutes that simply provided guidelines for their respective professions' conduct.  In *Geary*, the plaintiff salesman had no duty, statutory or otherwise, to make judgements in matters of product safety.  In *McLaughlin*, the plaintiff office manager took it upon herself to test chemical levels and then complain to her superiors.  The Pennsylvania Supreme Court found that an internal complaint to an employer citing violations of federal regulations, rather than Commonwealth policy, could not support the plaintiff's wrongful discharge claim.

Here, Plaintiff had an affirmative statutory duty to ensure the safety of the residents and employees of the nursing home.  His lawsuit is predicated on a regulatory scheme created by the Commonwealth of Pennsylvania that sets forth state, not federal policy.  Moreover, Plaintiff had a duty to communicate with management and resolve issues concerning resident care.  Plaintiff complied with his duties by transmitting the October 19 letter and he alleges that he was fired as

a result. While an internal complaint to an employer generally will not suffice for a wrongful discharge claim, we are satisfied that under the circumstances present here, where an individual has a statutory duty to ensure the safety of others, it would contravene the public policy of this Commonwealth to deny Plaintiff the right to pursue his claim for wrongful discharge.

We therefore find that Plaintiff has sufficiently alleged that Defendants wrongfully terminated his employment under the public policy exception. Accordingly, we will deny Defendants' Motion to dismiss Plaintiff's wrongful termination claim.

### B. Pennsylvania Whistleblower Law

Plaintiff argues that his termination violated the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. § 1421 *et seq.* Defendants argue that (1) Plaintiff may not invoke the Whistleblower Law because Defendants are not public bodies, and (2) Plaintiff fails to allege that he made a good-faith report of waste or wrongdoing.

The Whistleblower Law makes it unlawful for an employer to:

> discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, locations or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste.

*Id.* § 1423(a). An "employer" is defined as a "person supervising one or more employees, including the employee in question; a superior of that supervisor; or an agent of a public body." *Id.* § 1422. An "employee" is defined as a "person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied, for a public body." *Id.* A "public body" includes a "body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision
11

authority or a member or employee of that body." *Id.*

The issue to be resolved here is whether Defendants are "public bod[ies]" by virtue of their receipt of Medicaid funds through the state. The Pennsylvania Supreme Court has not directly addressed this question. Accordingly, we must predict how the state's high court would resolve this issue. *See Jewelcor Inc. v. Karfunkel*, 517 F.3d 672, 676 n.4 (3d Cir. 2008). "Although not dispositive, decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise." *City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993).

Plaintiff and Defendants point us to conflicting authorities. Plaintiff cites *Cohen v. Salick Health Care, Inc.*, 772 F. Supp. 1521 (E.D. Pa. 1991). Defendants cite *Denton v. Silver Stream Nursing & Rehabilitation Center*, 739 A.2d 571 (Pa. Super. Ct. 1999), and *Langoussis v. Easton Hospital*, No. 00-1456, 2002 WL 32140636 (Pa. Com. Pl. 2002). In *Cohen*, the late Judge Raymond Broderick of this court, sitting in diversity, predicted that the Pennsylvania Supreme Court would find that the receipt of Medicaid reimbursements is not sufficient to make an entity a "public body" under the Whistleblower Law. 772 F. Supp. at 1526. The Whistleblower Law defines public bodies as those which are "funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body." 43 Pa. Cons. Stat. § 1422. The *Cohen* court began its analysis with the understanding that the legislature, through this provision, intended to make the law applicable to bodies that receive even one dollar of state funding. 772 F. Supp. at 1526. The court observed, however, that the statutory language and the legislative history of the Act failed to define the word "funded." *Id.* The court went on to discuss the nature of Medicaid. Title XIX of the Social Security Act established the Medicaid

program in which the federal government reimburses states for a percentage of the cost of providing medical care to certain persons. 42 U.S.C. § 1396 *et seq.* (1988); *Pennsylvania v. U.S. Dep't of Health & Human Servs.*, 928 F.2d 1378, 1381 (3d Cir. 1991). Specifically, Medicaid authorizes:

> Federal grants to States for medical assistance to low-income persons who are age 65 or over, blind, disabled, or members of families with dependent children or qualified pregnant women or children. The program is jointly financed by the Federal and State governments and administered by States. Within broad Federal rules, each State decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. Payments for services are made directly by the State to the individuals or entities that furnish the services.

42 C.F.R. § 430.0.

The *Cohen* court found that the "legislature did not intend that the mere receipt of monies from a state source for services rendered should bring the recipient within the Whistleblower Law." 772 F. Supp. at 1527. It found that such an interpretation would "extend the reach of the Whistleblower Law to every hospital, nursing home, institution for the mentally retarded, institution for the mentally ill, home health care provider, physician, chiropractor, podiatrist, ambulance company, dentist, and optometrist that treats patients whose medical expenses are reimbursed by Medicaid." *Id.* at 1526. The intended beneficiaries of Medicaid are patients, not healthcare providers. *Id.* (citing *Geriatrics, Inc. v. Harris*, 640 F.2d 262, 265 (10th Cir. 1981)). Interpreting the provision's text as part of the broader statutory scheme, the court determined that:

> the words "funded by or through" suggest a specifically appropriated amount of State funds to a public body. The language "funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body" was intended by the legislature to be limited to monies which were appropriated by the legislature for the purpose of aiding "public bodies" in pursuit

of their public goals.

*Id.* Based on the court's interpretation of the word "funded," the plaintiff in *Cohen* did not state a cause of action against the defendant employer under the Whistleblower Law.

Eight years later, in a matter of first impression, the Superior Court of Pennsylvania expressly rejected the *Cohen* analysis. *Denton*, 739 A.2d at 575-76. The *Denton* Court relied, in part, on the decision of an en banc panel of the Superior Court that had addressed the question of whether a private medical provider may be a "public body" within the Whistleblower Law, based on the receipt of public money. *Id.* at 576 (citing *Riggio v. Burns*, 711 A.2d 497, 499-500 (Pa. Super. Ct. 1999) (en banc)). In *Riggio*, the court noted that the state legislature annually appropriated money for defendant Medical College of Pennsylvania (MCP).[3] 711 A.2d at 499. MCP admitted that it received the appropriated funds but argued that it would "warp the plain meaning of the term 'public body'" to include in that designation all private entities that received state appropriations. *Id.* at 500. The court held that the statute plainly and unequivocally makes any body "funded in any amount by or through Commonwealth . . . authority" a public body for purposes of the Whistleblower Law. *Id.* (citing 43 Pa. Stat. Ann. § 1422). The *Riggio* court specifically found that *Cohen* addressed "a much more complicated question from that which presents itself instantly" and that "the issue of whether Medicaid reimbursements constitute funding is not before us." *Id.*

*Denton* directly addressed the Medicaid issue. *Denton* found that the "plain meaning of the language of the statute makes it clear that it was intended to apply to all agencies that receive

---

[3] In one fiscal year, the legislature appropriated over $4.5 million to MCP. *Riggio*, 711 A.2d at 499 n.2.

public monies under the administration of the Commonwealth." 739 A.2d at 576. The court extended the holding in *Riggio*, and rejected the statutory interpretation in *Cohen*:

> We do not find that legislatively appropriated funds are the only monies that will create "public body" status under the Whistleblower Law. The statutory language differentiates between appropriated and "pass-through" funds and extends the law to cover both types: "[a]ny other body which is . . . funded in any amount by *or through* Commonwealth . . . ." 43 P.S. §1422 (emphasis added). The Law clearly indicates that it is intended to be applied to bodies that receive not only money appropriated *by* the Commonwealth, but also public money that passes *through* the Commonwealth.

*Id. Denton* held that a recipient of Medicaid funding is a "public body" under the Whistleblower Law.

While we accord significant weight to the Superior Court's analysis, we agree with *Cohen* that the receipt of Medicaid reimbursements is insufficient to make an otherwise private entity, a public body subject to Whistleblower Law liability. The words "funded in any amount by or through" are naturally read to denote money that is specifically appropriated by a governmental unit. Such appropriations may come in the form of periodic or one-time payments, but they are not controlled by the whims of patients eligible for Medicaid.

This reading is supported by the statutory scheme. Healthcare providers are not the intended beneficiaries of the Medicaid program. *Geriatrics*, 640 F.2d at 265. Medicaid does confer financial benefits upon healthcare providers insofar as it expands the number of patients paying for medical services. However, a governmental assistance program, which directly benefits eligible participants and indirectly benefits private bodies, does not qualify as funding by the Commonwealth. A contrary ruling could justify the conclusion that other assistance programs, such as food stamps, similarly transform private entities into public bodies. The

15

legislature could not have intended to create a cause of action under the Whistleblower Law for a former employee of a local grocery store that accepted food stamps. If we accept Plaintiff's argument as to the definition of "funded," the scope of the Whistleblower Law could be expanded to include any private business that accepted payment from a recipient of government assistance. We are satisfied that this is not what the Legislature intended.

We are not persuaded by the analysis in *Denton*. The court there relied on *Riggio*, a case which was factually distinguishable. *See Denton*, 739 A.2d at 576 ("Our own subsequent and binding state case law directs us to a different conclusion."). The defendant in *Riggio* conceded that it received annual appropriations from the legislature. 711 A.2d at 499. Nevertheless, the defendant medical college argued that it was not funded by the Commonwealth because that would lead to an absurd result. *Id.* at 500. The court rejected this argument based upon the plain language of the statute. *Id.* In *Denton*, as here, the plaintiff did not contend that the defendant received any appropriated money from the state. The question is whether the receipt of Medicaid payments alone exposes an otherwise private employer to whistleblower liability. *Riggio* is of little assistance in determining the meaning of the word "funded" in this context.

Finally, we reject the conclusion of the *Denton* court that by definition all "pass through" funds from the state have the effect of creating a "public body." *See* 739 A.2d at 576 ("The statutory language differentiates between appropriated and 'pass-through' funds and extends the law to cover both types: '[a]ny other body which is . . . funded in any amount by *or through* Commonwealth . . . .'"). As Judge Broderick observed:

> Although there is no question that many doctors and other health care providers receive "funds" for services rendered to Medicaid eligible patients, it was clearly not the intention of the Pennsylvania legislature to include them as funded public bodies

> under the Whistleblower law. It is abundantly clear that the legislature did not intend that the mere receipt of monies from a state source for services rendered should bring the recipient within the Whistleblower Law.

*Cohen*, 772 F. Supp. at 1527.

We predict that the Pennsylvania Supreme Court will not interpret the Whistleblower Law to bring Defendants within the definition of "public bod[ies]." Accordingly, we will grant Defendants' Motion to dismiss Plaintiff's Whistleblower Law claim.

### C.     42 U.S.C. § 1981

Section 1981 prohibits racial discrimination in the making and enforcing of contracts. 42 U.S.C. § 1981(a).[4] Plaintiff's § 1981 claim is analyzed under the familiar *McDonnell Douglas* burden-shifting framework used in Title VII discrimination cases. *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Plaintiff has the burden of presenting a prima facie case of discrimination. Plaintiff must demonstrate: (1) that he belongs to a protected group; (2) that he was qualified for the job; (3) that, despite his qualifications, he was terminated; and (4) that the circumstances of his termination would lead to an inference of unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Stewart v. Rutgers Univ.*, 120 F.3d 426, 432 (3d Cir. 1997).

---

[4] This subsection reads:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

17

Defendants do not dispute that Plaintiff states three of the four elements of a prima facie case.[5]  (Defs.' Reply 6, ECF No. 11.)  Defendants' only argument is that Plaintiff fails to allege that he was qualified for the administrator position.  Defendants argue that the absence of such an allegation renders Plaintiff's § 1981 claim legally insufficient.

Plaintiff's Complaint does not specifically allege that Plaintiff was qualified for his position.  However, the *McDonnell Douglas* framework was "never intended to be rigid, mechanized, or ritualistic."  *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978).  Plaintiff, a licensed and registered nursing home administrator, worked as the administrator of Andorra Woods without incident for more than three years.  He was terminated within weeks of sending the October 19, 2010 letter.  There is noting in the record to indicate that his job performance was unsatisfactory.  We are satisfied that at this juncture it is reasonable to infer that Plaintiff was qualified for his position, based upon his credentials and his three-year tenure.

Accordingly, Plaintiff articulates a prima facie case of discrimination.  We therefore deny Defendants' Motion to dismiss Plaintiff's § 1981 claim.

## IV.   CONCLUSION

For all of these reasons, Defendants' Amended Motion will be granted in part and denied in part.

An appropriate Order follows.

**BY THE COURT:**

**/s/ R. BARCLAY SURRICK, J.**

---

[5] Plaintiff, who is Jewish, is entitled to bring suit under the federal civil rights statute. *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987).